The opinion of the Court was delivered by
Fenner, J.
Plaintiff and defendant, while they were both slaves, were married, with the consent of their owners, in 1842. He subsequently acquired his freedom by consent of his owner. She remained a slave until the abolition of slavery. After they were both free, they continued to live together as man and wife. Subsequently, plaintiff instituted proceedings for divorce against the defendant, and judgment was rendered therein, in her favor, decreeing a divorce, which was signed in July, 1877, and from which no appeal was ever taken.
, The present action is brought by plaintiff to have certain property, held and possessed by defendant, decreed to be property of the community which subsisted between the parties during their marriage, and to have the same partitioned by sale and to have an account of the revenues thereof since the dissolution of the marriage.
From a judgment in favor of plaintiff the defendant prosecutes the present appeal.
The legal issue presented is, whether a marriage of slaves, contracted with the consent of their owners, and ratified by continued cohabitation after their emancipation, produces the ordinary civil effects of. marriage, and whether those civil effects retroact to the date of the original marriage. We think correct principles and our jurisprudence leave no doubt on the question.
The Article 182 of our Civil Code of 1825, in force before the war, provided, “ slaves cannot marry without the consent of their masters, *861 and tlieir marriages do not produce any of the civil effects which result from such contract.”
This imports that slaves could marry with the consent of their masters, and it was long since held by this Court that, after the emancipation of the parties, such a contract of marriage “ legal and valid by the consent of the master and the moral', assent of .the slave, from .the moment of freedom, although dormant during the slavery, produces all the effects which result from such contract among free persons.” Girod vs. Lewis, 6 M. 559. In a later case, arising after the war, the children born of such a marriage claimed to be legitimate heirs of their parents, although that marriage had been dissolved by the death of one of the parties prior to their emancipation. The Court quoted and approved the above doctrine, but said :
“ We think that the marriage which is to produce these civil results must exist at the time the emancipation takes place. In this case, .the. marriage was dissolved before emancipation. The parties’ rights, therefore, were not dormant; - they were dead; and the subsequent emancipation, as it could not resuscitate the marriage, could produce none of the civil fruits which are the results of a civil marriage.” Pierre vs. Fournette, 25 An. 617.
This indicates the clear opinion of the Court, that bad the marriage continued at the date of emancipation, the children, though born during slavery, would have been legitimate. And so it was directly-decided in a still later case, where the broad doctrine was laid down, that u as to tliosq who were slaves, their own consent and that of tlieir masters were alone sufficient to give t.<? their marriage an undeniable validity, one which produced no effect as long as they were held in bondage, but which, from their emancipation, has.secured for them and their posterity the rights and privileges bestowed by the State on a marriage authorized and sanctioned by its laws.” Succession of Pearce, 30 An. 1168.
From all these cases it results that the civil effects of such marriages were only dormant during slavery, and that emancipation operated not a creation or birth of such rights, but merely an awakening of them.
If the legitimacy of children, which is one of the civil effects of marriage, takes effect after emancipation, we see no reason why the community of acquets and gains, which is another civil effect, should not equally do so ; and if the birth of children during the slavery does not prevent their legitimacy after emancipation, we do not see why-property acquired while one of the parties was a slave should not equally fall into the community which takes effect after freedom.
The wife, even while a slave, no doubt contributed to the common welfare of the marital estate, by the performance of those duties, such *862 as household cares, care of children, etc., which form the consideration of her interest in the connubial partnership. And in this case evidence is not wanting that she contributed her private earnings towards the purchase of her husband’s freedom.
There existed under the civil- law certain impediments to marriage described as being ex eausápotestatis, preventing the intermarriage of persons bearing certain relations to capli other, such as tutor and ward, as to which it was held, that in case of such prohibited marriages, “ the subsequent voluntary cohabitation of the parties, after the relation which caused the prohibition had ceased, rendered the marriage valid ab initio.'’
So with marriages originally void by reason of fraud, error or violence, cohabitation after restoration of freedom, or discovery of errors or fraud, produced like effect. 1 Bishop on Mar. §§311, 139, 140, 100 et seq.
We think a like principle is applicable here. The impediments to the civil effects of slave marriages validly contracted with- the consent of the masters, were the consequence of their civil status, the artificial creature of the law, and when, by change of laws, such status was altered to one permitting the full civil effects of their'marriage, and the parties thereafter continued to cohabit, such ratification retroacted to the date of the original marriage and entailed all the civil effects ab initio.
Such was the conclusion of the District Judge, and we consider it a sound, humane and equitable solution of the .question.
Judgment affirmed with costs.
Rehearing refused.
Levy, J., absent.